# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA SZCZEPANSKI, | ) | CASE NO. 1:19-cv-00191 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Joshua Szczepanski ("Plaintiff" or "Szczepanski"), challenges the final decision

of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his

application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title

II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be **AFFIRMED**.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On February 29, 2016, Szczepanski filed an application for POD and DIB, alleging a disability onset date of February 1, 2015 and claiming he was disabled due to depression, memory problems, concentration problems, antisocial, bi-polar, anxiety/panic, ADHD, sleep problems, obesity, and fatigue.  (Transcript ("Tr.") at 70.)  The application was denied initially and upon reconsideration, and Szczepanski requested a hearing before an administrative law judge ("ALJ").  (Tr. 12.)

On January 29, 2018, an ALJ held a hearing, during which Szczepanski, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 12.)  On May 24, 2018, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 12-24.)  The ALJ's decision became final on December 31, 2018, when the Appeals Council declined further review.  (*Id*. at 1.)

On January 25, 2019, Szczepanski filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14 & 15.)  Szczepanski asserts the following assignments of error:

(1)　　The ALJ's discussion of treating psychiatrist Joanna Koutros, M.D.'s medical opinion does not comport with the treating physician rule.

(2)　　The ALJ's analysis of Plaintiff's statements does not comport with Social Security Ruling 16-3p.

(Doc. No. 12 at 10.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Szczepanski was born in April 1983 and was 34 years old on the date of his hearing, making him a "younger" person under social security regulations.  (Tr. 22.)  *See* 20 C.F.R. §§ 404.1563 &

416.963.  He has at least a high school education and is able to communicate in English.  (*Id.*)  He has past relevant work as a peace officer, an Army National Guard MP, and a lab courier.  (*Id*. at 43.)

**B.     Relevant Medical Evidence**[2]

**1.     Mental Impairments**

On January 21, 2014, Szczepanski went to Cleveland Clinic neurologist Joseph Rudolph, M.D., for an evaluation of post-concussive symptoms following a car accident which had occurred on January 2, 2014.  (Tr. 320.)   Dr. Rudolph noted that Szczepanski began to notice memory and concentration issues two days after the accident, and had since developed additional issues such as heightened irritability, inability to deal with stress and difficulty waking up in the morning.  (*Id.*) Szczepanski also reported continuing headaches, intensifying every afternoon between 3-5 p.m.  (*Id.* at 321.)   Dr. Rudolph reviewed a CT scan of Szczepanski's head, and found it negative for blood or other pathology.  (*Id.* at 322.) He recommended Szczepanski "consider adding an antidepressant for pain and remodeling issues."  (*Id.*)

On February 26, 2016, Szczepanski had a diagnostic assessment at Beacon Health.  (*Id.* at 360.) The therapist assessing him, Earlene Johnson, LCSW, noted that Szczepanski described "thoughts of being worthless at times" and that he "believes that people talk about him."  (*Id.* at 365.)  Szczepanski reported "not wanting to get out of bed or even do personal care," but the therapist noted that he "presents with being neat, clean and with mild body odor."  (*Id.* at 364-65.) She diagnosed him with major depressive disorder, recurrent and ADHD.  (*Id.* at 366.)

On April 19, 2016, Szczepanski was seen by psychiatrist Peter Golden, M.D., for a

---

[2]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

psychiatric assessment. (*Id.* at 371.) He told Dr. Golden that he suffered a concussion in the January 2014 car accident and "has not been the same since." (*Id.*) He described himself as both "angry at everything" and "does not care about anything." (*Id.*) Dr. Golden diagnosed major depressive disorder and ADHD. (*Id.* at 374.) He noted the Adderall that Szczepanski took daily might be contributing to his difficulty in falling asleep, so he reduced that medication and added Lexapro to treat Szczepanski's depression and anxiety. (*Id.*) Dr. Golden saw Szczepanski again in May and June 2016, when he noted that the Lexapro had only minimally improved Szczepanski's symptoms and therefore switched him to Cymbalta. (*Id.* at 391-92, 394.)

On October 18, 2016, Szczepanski saw psychiatrist Joanna Koutros, M.D.[3] (*Id.* at 398.) He reported that he had not taken Cymbalta in "a while," although he continued to take Adderall. (*Id.*) She noted he was "well-groomed" but guarded, anxious, and depressed with a "tangential" thought process. (*Id.* at 400-01.) She diagnosed him with major depressive disorder, recurrent, moderate and prescribed Zoloft. (*Id.* at 401.)

On November 10, 2016, on the recommendation of his criminal attorney, Szczepanski and his wife met with Farshid Afsarifard, Ph.D., a clinical and forensic psychologist. (*Id.* at 403.) Dr. Afsarifard noted Szczepanski "was cooperative with this evaluation, but engaged in a distant manner," with a "sad and anxious" affect and a "tone of irritability." (*Id.* at 405.) He observed Szczepanski "appeared to be willing to admit to his personality flaws and at times, even exaggerated

---

[3] In Defendant's Brief on the Merits, he repeatedly attributes care provided by Dr. Koutros to "Dr. Diane Eden." (Doc. No. 14 at 4-6.) In fact, those medical records are either signed by Dr. Joanna Koutros, or they list Dr. Koutros as the sole doctor "contributing to the medical record." (*See, e.g.,* Tr. 401, 439, 444, 449, 458, 463, 468, 480.) There is no evidence in the record that Dr. Diane Eden ever provided care to Szczepanski, and the ALJ acknowledged in his opinion that Dr. Koutros had a "long-term treating relationship" with Szczepanski. (Tr. 21.)

them to some extent." (*Id.* at 406.) Dr. Afsarifard concluded:

> Psychologically, [Szczepanski] appears to have a significant mental health problem that has been exacerbated by the current stressors of his life. Given the slow progress with traditional outpatient mental health services, participation in an intensive outpatient or partial hospitalization program is likely to improve his chances of recovery. He should also refrain from alcohol consumption during the active course of his treatment in order to avoid being impacted by the depressive aspects of alcohol.

(*Id.* at 408.)

Dr. Koutros saw Szczepanski on November 29 and December 20, 2016, for medication monitoring. (*Id.* at 445, 440.) At the first visit, Dr. Koutros noted that his unresolved legal troubles were contributing to his depression. (*Id.* at 445.) At the second appointment, his wife told Dr. Koutros that since he received his sentence of "60 days house arrest and 20 days jail," he had "been increasingly depressed and anxious" and "pretty much stopped talking." (*Id.* at 440.) Dr. Koutros noted that he "was not willing to speak for most of the appointment." (*Id.*)

Szczepanski told both Dr. Koutros and Dr. Afsarifard that he had recurring panic attacks. (*Id.* at 405, 445.) On December 26, 2016, an ambulance brought him to the Emergency Department at Hillcrest Hospital with symptoms of an anxiety attack and chest pressure. (*Id.* at 412-13.) He was at first nonverbal, then abusive and uncooperative with medical staff. (*Id.* at 412.) Ativan "significantly calmed" him, and tests showed no signs of cardiac impairment. (*Id.* at 416.)

Dr. Afsarifard met again with Szczepanski on January 3, 2017, after he had been sentenced. On February 3, 2017, Dr. Afsarifard wrote about this meeting in a letter to Szczepanski's criminal attorney, describing Szczepanski as "highly agitated and anxious, with his thoughts being disoriented and confused" as well as "fixated on the thought that he would not be able to tolerate any period of confinement because of his anxiety and history of panic attacks." (*Id.* at 500.) He wrote that he was

"very concerned about [Szczepanski's] state of mind and his reaction to his sentence." (*Id.*)

Dr. Koutros continued to see Szczepanski periodically for medication monitoring. On February 14, 2017, she noted his jail sentence had been suspended and he had completed his period of house arrest. (*Id.* at 434.) He still reported significant anxiety when he tried to go to the movies or "if he has to talk to people," but he reported "he has been able to dig out of the hole he was in when it comes to depression," and was "sleeping better and on a more 'normal' schedule." (*Id.*) She observed that "the differences in his mood have all correlated with the situations happening around him." (*Id.*) He also attended counseling appointments on February 16 and 21, 2017. (*Id.* at 450-52.)

On June 21, 2017, Dr. Koutros noted Szczepanski continued to struggle with "depression, lack of motivation, low energy" and reported he "[d]oesn't feel like a productive human being." (*Id.* at 486.) He also reported an increase in headaches since starting Wellbutrin, but "doesn't find the headaches to be that bothersome." (*Id.*) He appeared disheveled and had a "eurythmic, restricted" affect. (*Id.* at 482.)

On July 20, 2017, Dr. Koutros reported that Szczepanski's anxiety had "flared up" because "the appeal on his case came through and the judgment was upheld." (*Id.* at 481.) He reported that he was "worrying more, back to not leaving the house much." (*Id.*) He appeared disheveled and had a "dysthemic, restricted" affect. (*Id.* at 482.)

On September 7, 2017, Dr. Koutros noted Szczepanski's legal concerns were unresolved: "the hearing in August was more of a status hearing, and it will not be until the October hearing that things get resolved." (*Id.* at 476.) His anxiety and depression were elevated and he reported that he "[t]hinks about his legal issues all the time, and often can't stop thinking about it." (*Id.*) He reported that his inability to focus was "worse than usual" and that he was "very irritable, snaps at his wife

all the time." (*Id.*) He had stopped taking Wellbutrin, and no longer experienced headaches. (*Id.*) He appeared disheveled, with intermittent eye contact and a "eurythmic, restricted" affect. (*Id.* at 477.) Dr. Koutros prescribed Abilify. (*Id.* at 479.)

On the same day, September 7, Dr. Koutros filled out an "Off-task/Absenteeism Questionnaire" intended to "amplify and summarize" her records. (*Id.* at 471.) She checked a box to indicate that Szczepanski would "likely be off-task at least 20% of the time (exclusive of ½ hour lunch break and two 15 minute breaks)." (*Id.*) She wrote that he suffered "anxiety/depression as a result of legal issues, which cause focus/attention/concentration difficulties," and noted these impairments had existed "since his sentencing - December 2016." (*Id.*)

On October 12, 2017, Dr. Koutros noted Szczepanski hadn't been able to fill the Abilify prescription due to cost. (*Id.* at 508.) In addition, "[t]hings with his court case were really stressful for a while, which caused his anxiety to spike." (*Id.*) Once he "found out things would likely go in his favor" and then was "sentenced to 21 days house arrest" he had been "sleeping all day every day as if catching up on all the lost sleep he had prior. Mood a little better. Anxiety has calmed down a little." (*Id.*) He appeared disheveled, with intermittent eye contact and a "eurythmic, restricted" affect. (*Id.* at 509.) She noted he was tolerating Zoloft "without problem" and added a new medication, Geodon. (*Id.* at 508, 510.) He scored 25 on the PHQ-9 Patient Heath Questionnaire, consistent with both his previous scores and a diagnosis of "severe depression." (*Id.* at 510-11.)

On November 11, 2017, Dr. Koutros again began her clinical notes with a description of Szczepanski's legal issues: he was "currently on house arrest." (*Id.* at 503.) Geodon, which he took in the evening, sedated him but also helped relieve his depression. (*Id.*) He reported "more motivation" and that he felt "calmer, not as restless." (*Id.*) He appeared disheveled, made

intermittent eye contact and exhibited a "eurythmic, restricted" affect. (*Id.* at 504.) He scored 19 on the PHQ-9 Patient Heath Questionnaire, a significant improvement over his previous scores and consistent with a diagnosis of "moderate severe depression." (*Id.* at 505-06.)

### 2. Physical Impairments

The ALJ recognized "obesity and fatigue" as "non-severe impairments" in his opinion. (*Id.* at 14.) Szczepanski did not contest the ALJ's determination that these physical impairments have resulted in a frequency or severity expected to cause no more than a "minimal work-related limitation," so no physical impairments will be considered here. (*Id.*)

## C. State Agency Reports

### 1. Mental Impairments

Leslie Rudy, Ph.D. reviewed Szczepanski's medical records on May 4, 2016. (*Id.* at 76.) She opined that he had medically determinable impairments of ADD/ADHD and affective disorders, both severe. (*Id.* at 75.) She found his statements regarding his symptoms of extreme anxiety, sleep disturbances, fatigue and obesity to be fully consistent with the total medical and non-medical evidence in the file, noting "technically, [claimant] is obese and may experience fatigue from psych or from obesity." (*Id.* at 77.) However, she did not find his statements about the intensity, persistence, and functionally limiting effects of his symptoms to be substantiated by the objective medical evidence alone. (*Id.* at 76.) She opined that he had the following psychological limitations to his residual functional capacity:

- "[He] retains the ability to perform work [without] fast pace or high production quotas. He should not be responsible for complex work-related decisions." (*Id.* at 78.)

- "He is able to interact with the general public occasionally and his

[supervisors and] coworkers frequently." (*Id.*)

- "Stress tolerance is limited, but he is able to adapt to occasional changes in a relatively static setting." (*Id.* at 79.)

Kathleen Malloy, Ph.D., reviewed Szczepanski's medical records on August 31, 2016. (*Id.* at 92.)  She concurred with Dr. Rudy's opinion regarding Szczepanski's medically determinable impairments, and the credibility of his statements.  (*Id.* at 89-90.)  She opined that he had the following psychological limitations to his residual functional capacity:

- "[Claimant] reports difficulty with concentration.  Not commented on by [treating source]. [Claimant] retains the ability to perform work [without] fast pace or high production quotas.  He should not be responsible for complex work-related decisions." (*Id.* at 91.)

- "He can maintain brief, superficial social interactions."  (*Id.*)

- "Stress tolerance is limited, but he is able to adapt to occasional changes in a relatively static setting." (*Id.* at 92.)

## 2.      Physical Impairments

Michael Hallet, M.D., reviewed Szczepanski's medical records on April 27, 2016. (*Id.* at 75.) He noted that Szczepanski had no medically determinable impairments, and although his BMI is obese, that "does not affect daily living more than minimally." (*Id.* at 74-75.)

Mehr Siddiqui, M.D., reviewed Szczepanski's medical records on August 24, 2016. (*Id.* at 87-88.)  He concurred with Dr. Hallet.  (*Id.*)

## D.     Hearing Testimony

During the January 29, 2018 hearing, Szczepanski testified to the following:

- He lives in Mentor, Ohio.  (*Id.* at 34.)

- He is 5 foot 7 inches tall, and weighs 265 pounds.  (*Id.*)

9

- He is married. (*Id.* at 35.)

- He has a driver's license, but drives "very infrequently . . . usually late at night and not alone." His wife drove him to the hearing. (*Id.*)

- He doesn't take public transportation very much. He only travels on public transportation with his wife when they are coming downtown, "so that she doesn't have to drive downtown." (*Id.*)

- His use of public transportation is limited because "since we live out in Lake County, we don't have a lot to do," the public transportation system in Lake County "isn't the best," and his wife is able to drive him. (*Id.* at 36.)

- There was a civil suit filed because of the car accident Szczepanski was in. It settled and he received "a small amount" of money from that. (*Id.*)

- He has three associates degrees: "an associates of science and criminal justice law enforcement. An associate of science and criminal justice corrections. And an associate of arts." (*Id.* at 36-37.)

- He served in the Army National Guard from either 2008 or 2009 to either 2010 or 2011 as a military police specialist. (*Id.* at 37.)

- When he was very young, he believes he was in special ed classes for ADD. (*Id.*)

- He can read, write, and speak English, and add, subtract, and understand simple math. (*Id.*)

- He completed the civilian police academy in Ohio, which is a four-month program that leads to certification. (*Id.* at 38.)

- He has not worked full time since February 1, 2015, and has not attempted to work beyond "maybe" filling out one job application. (*Id.*)

- From 2010 until "around 2012," he worked as a police officer for the Village of Grand River and the Village of Windham, both in Ohio. In these jobs, he was out patrolling, and sometimes had to restrain suspects. He carried a firearm. (*Id.* at 39.)

- His was full time in the Army National Guard only for the first six months of training, which was "active duty." Being a military police officer was similar to being a civilian police officer in terms of duties and responsibilities. (*Id.* at 40.)

- He also worked as security guard to supplement his income, but this work was not

10

full time. Working as a security guard was similar to being a civilian police officer in terms of duties.  (*Id.* at 40-41.)

- After he worked as a police officer, Szczepanski worked as a self-employed lab courier.  He would pick up lab samples from different area hospitals and drop them off at the main labs.  (*Id.* at 41.)

- As a lab courier, he had to lift 30 to 50 pounds.  (*Id.* at 42.)

- Prior to his work as a police officer, he worked in "fast food jobs."  (*Id.* at 42.)

- He has not been able to work full time for the past three years because, after his car accident, he "started finding it hard to get up in the morning," and was unable to maintain his previous schedule of working 14 to 16 hours a day.  (*Id.* at 43.)

- He had "some memory issues" immediately after the car accident, and developed anxiety about being in a car.  (*Id.* at 43-44.)

- The car accident occurred when the car he was in got rear-ended in the snow, and after that he became "hypersensitive" about other cars around him.  As a result, in the 13 months following the accident, he cut back on his work as a lab courier, and gave up accounts until he had limited his schedule to a couple of hours of driving in the middle of the day, but he was "finding it even hard to keep up with that."  He would begin worrying about "just busy interchanges or busy intersections that I knew I had to go through that would give me anxiety," before he even left the house. (*Id.* at 44.)

- He did not get any treatment for his anxiety at that time.  (*Id.*)

- He is currently receiving treatment for his depression and anxiety - both therapy and medication.  He feels the treatment is "helping some."  (*Id.* at 45.)

- His ability to drive has "gotten worse," which he attributes to infrequent practice. The sight of headlights behind him causes him to "tense up and I lock up."  (*Id.*)

- He was on medication for his ADD while working as a lab courier before his accident, however, he had to stop taking that medication after the accident because it was making his anxiety worse.  (*Id.* at 45-46.)

- He has suicidal thoughts, but has never attempted suicide.  He has what his doctor refers to as a "passive death wish."  (*Id.* at 46.)

- He has no thoughts or actions to harm anyone else.  (*Id.* at 46-47.)

11

- He has no hallucinations or delusions.  (*Id.* at 47.)

- He feels unable to handle money or manage his affairs. He is even unable fill out paperwork such as his application for Social Security.  When forms ask for a phone number, he always lists his wife's number because he gets "terrible anxiety about having to talk to people on the phone."  (*Id.*)

- When he was running his lab courier business, prior to the car accident, he kept records and managed money for his business. (*Id.* at 48.)

- After the car accident, he was able to work "to a lesser extent" for about a year before he had to stop.  (*Id.*)

-  He continues to have "memory issues," for example, he "quite frequently" forgets doctor's appointments.  He relies on his wife to "give me constant reminders."  (*Id.*)

- Prior to the accident, "I used to know where I had to be a week in advance and. . . have everything planned out." (*Id.*)

- In spring 2015, he was subpoenaed to testify before a grand jury, which was his "first inclination" that he was in legal trouble.  It related to his work as a part-time certified firearms instructor teaching the class that is required to receive a concealed carry permit in Ohio.  State law requires that instructors teach ten hours of classroom instruction and two hours of range instruction.  Szczepanski taught only five hours of classroom instruction, but provided documentation that the students had completed the required ten hours of instruction. (*Id.* at 49-50.)

- His anxiety got worse as he awaited sentencing, and improved after he was sentenced to home confinement.  (*Id.* at 50-51.)

- He has completed all of his sentence, including probation.  (*Id.* at 51.)

- Completing his sentence hasn't improved his mental health.  (*Id.* at 52.)

- Because he pled guilty to a felony, Szczepanski can no longer work in law enforcement.  (*Id.*)

- He had already left law enforcement before the legal issue arose, because his schedule as a police officer was "terrible," and the salary was not sufficient to support the family that he hoped to start with his wife.  (*Id.* at 53.)

- His sleep has also been affected by his mental problems.  Right after the car

12

accident, he "would wake up with bad dreams, sporadically in the night." He only got "two or three hours of sleep." Now, the medication that he is on makes him drowsy, and "it's almost gone the other way where I fall asleep very, very early and tend to sleep in later." (*Id.*)

- On a normal day, he wakes around 9 or 10 in the morning. He will "lay in bed and . . . tool around on my cell phone and incessantly check my email." He will "go from app to app" but "if you ask me later, I couldn't really even tell you what I just did." Then he gets out of bed and will "sit in front of the tv for a while." He isn't really watching it, because although it is on, he "can never tell you what's or what they were just talking about or what the show's even about." (*Id.* at 54.)

- He has trouble with basic hygiene. He will "bathe or shower twice a week, on a good week." He doesn't think he has brushed his teeth "this year." He shaves "infrequently" and neglects his hair. (*Id.*)

- His wife handles all the outdoor chores, such as gardening and shoveling snow. (*Id.* at 54-55.)

- During this period he "drank socially maybe a little too much," to cope with stressful social situations, but he doesn't believe it has "risen to the level of an addiction." (*Id.* at 55.)

- He sees a therapist once a month and a psychiatrist "between once a month and once every three months." They have not told him that he needs any additional medication, therapy or treatment. (*Id.*)

- Szczepanski and his wife have Cavaliers season tickets, and rarely attend games. (*Id.*)

- He and his wife traveled to Boston to attend a Katy Perry concert, but when they got there he "practically didn't leave the hotel room, didn't really want to leave." They arrived late at the concert and he "spent almost the entire time at the bar or in the bathroom." (*Id.* at 56.)

- He and his wife went to the ALDS "the year that Cleveland made the World Series" and he was in the bathroom for the home run. (*Id.*)

- He continues to buy these tickets because he doesn't "want this to be a lifelong thing." He doesn't enjoy the way that he is now. He misses the way that he was. (*Id.*)

- He was making the most money he had ever made in his life as a lab courier,

13

although because of tax write-offs related to self-employment his taxes don't show that. (*Id.* at 57.)

- He, his therapist and his psychiatrist all think his prognosis is good. He does not believe this will "be a lifelong thing." (*Id.*)

- He does not believe he could have worked any full time job at any point in the past three years. (*Id.*)

- He is not taking specific sleep medications, and the only unintended side effects that he has experienced from his medications are headaches, which were made worse by a medication he was taking "in early spring." (*Id.* at 58.)

- That medication was switched due to the headaches, and he no longer takes it. (*Id.* at 61.)

- He has gained almost 100 pounds since the car accident. (*Id.* at 59.)

- His wife had to begin working from home to be available to provide care for him, such as transportation to doctor's appointments and companionship, because his "anxiety started to get so bad that just her presence in the house . . . was calming." (*Id.* at 59-60.)

- His anxiety is triggered by cars, the act or thought of driving, answering the phone, answering questions, and social situations in general. (*Id.* at 60.)

The VE testified Szczepanski had past work as a courier and police officer. (*Id.* at 62-62.)

The ALJ then posed the following hypothetical question:

> Imagine an individual with the same age, education and experience as the claimant. He is capable of all levels of exertion but has additional mental limitations: he is limited to performing simple, routine tasks, but not at a fast-paced or high-production-quota rate. He is limited to simple, work-related decisions and occasional and superficial interaction with supervisors, co-workers and the public, meaning no arbitration, confrontation, negotiation, supervising others or operating a motor vehicle. And he is limited to tolerating few changes in the routine work setting, defined as occasional. Would this individual be able to perform the past jobs you described either as actually performed or as generally performed in the national economy?

(*Id.* at 63.)

14

The VE testified the hypothetical individual would not be able to perform his past work as either a police officer or a courier. (*Id.*) The ALJ further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as laundry worker, wire worker, or electronics worker. (*Id.* at 64.)

The ALJ then posed a second hypothetical question:

> Imagine an individual with the same age, education and experience as the claimant. He is capable of all levels of exertion but his conditions require him to be off-task 20 percent of a regular workday, exclusive of normal breaks, and/or absent more than two days a month, including tardies and late arrivals or early departures. Would these conditions individually or together preclude competitive work?

(*Id.* at 64-65.)

The VE testified that either of those conditions, individually, would prevent competitive employment. If the hypothetical individual was off-task more than 10 percent of a regular work day, outside of regular breaks and meals, most employers would find that unacceptable. If the individual was regularly absent more than one day a month, they would be replaced fairly quickly. (*Id.* at 65.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

15

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.15209(c) and 416.9209(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Szczepanski was insured on his alleged disability onset date, February 1, 2015, and remained insured through September 30, 2017, his date last insured ("DLI.") (Tr. 12.) Therefore, in order to be entitled to POD and DIB, Szczepanski must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period

precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2017.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of February 1, 2015, through his date last insured of September 30, 2017 (20 CFR 404.1571 *et seq.*)

3. Through the date last insured, the claimant had the following severe impairments: ADD/ADHD, depression, and anxiety (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a range of work at all exertion levels but with the following nonexertional limitations: the claimant can perform simple, routine tasks, but not at a fast-paced or high-production quota rate; the claimant can make simple, work-related decisions; only have occasional and superficial interaction with supervisors, co-workers and the public (meaning no arbitration, mediation, confrontation, negotiation, supervising others, or operating a motor vehicle); and only tolerate few changes in the routine work setting (defined as occasional).

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born April **, 1983 and was 34 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

17

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20CFR 404.1569 and 404.1569(a)).

11.   The claimant was not under a disability, as defined by the Social Security Act, at any time from February 1, 2015, the alleged onset date, through September 30, 2017, the date last insured (20 CFR 404.1520(g)).

(Tr. 14-23.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v.*

*Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11‑13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant

19

evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.        First Assignment of Error: the Treating Physician Rule.

Szczepanski asserts that the ALJ failed to satisfy the reason-giving requirement of the treating physician rule in his discussion of the "Off-track/Absenteeism Questionnaire" completed by his psychiatrist, Dr. Koutros, on September 7, 2017.  (Doc. No. 12 at 11.)  The ALJ gave Dr. Koutros' opinion "little weight."  (*Id.* at 12.)  On the questionnaire, Dr. Koutros opined that Szczepanski would be off-task at least 20% of the time (exclusive of ½ hour lunch break and two 15 minute breaks).  (*Id.* at 11.)  Szczepanski argues that, if the ALJ had given Dr. Koutros' opinion controlling weight, then he would have been found disabled based on the VE's response to the ALJ's second hypothetical. (*Id.* at 11.)  He asserts the ALJ erred in giving Dr. Koutros' opinion little weight because the ALJ's determinations that Dr. Koutros' opinion related to Plaintiff's stress from legal issues and did not reflect Szczepanski's mental status for more than a year are factually inaccurate and not supported by substantial evidence.  (*Id.* at 13-14.)

The Commissioner responds that the ALJ reasonably determined that Dr. Koutros' opinion was entitled to little weight because, in the opinion, Dr. Koutros wrote that "it was related to stress from Plaintiff's legal issues."  The Commissioner argues substantial evidence supports both that conclusion, and the ALJ's determination that this period of enhanced stress did not last for more than a year, as required for a finding of disability under 20 C.F.R. § 404.1509.  (*Id.* at 10.)

20

The Sixth Circuit has recognized that "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." (*Id.*)  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." (*Id.*) In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart,* 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96  6p,[4] 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376; 20 C.F.R.  § 404.1527(c)(2).[5]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not

---

[4]  SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306, at *1 (Soc. Sec. Admin. Mar. 27, 2017).

[5]  Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th

---

[6] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner     such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors     [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'"  *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 F. App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 F. App'x 464, 471 (6th Cir. 2014).

In this case, the ALJ recognized that Dr. Koutros has "a long-term treating relationship with the claimant."  (Tr. 21.)  He nevertheless ascribed little weight to her opinion because:

> The opinion relates to claimant's stress from legal issues.  Notes, explored above, demonstrate relief from this stress on October 12, 2017, following the claimant receiving a sentence to only 21 days of home confinement.  Although the claimant having legal problems was mentioned in notes in June, the first note of this type of aggravation does not appear until November 29, 2016.  In February, notes show the claimant was going through a period in which he felt better.  In fact, he planned to travel to a warmer climate where there were more things to do for a month.  Notes

23

of the claimant feeling aggravated returned again in July but had ended by October. This opinion does not reflect the claimant's mental status for more than a year in duration. The objective evidence and opinions of the consultative examiners support the claimant exhibited moderate symptoms on a longitudinal basis.

(Tr. 21.)

Szczepanski asserts the ALJ's determination that "Dr. Koutros' opinion related to Plaintiff's stress from legal issues and that Plaintiff's symptoms improved to the point of non-disability after his sentencing according to Dr. Koutros' treatment notes" is factually inaccurate. (Doc. No. 12 at 13.) He asserts Dr. Koutros' opinion covers a continuous 12-month period because "Dr. Koutros opined that the 20% off-task limitation began December 2016 after Plaintiff's sentencing," and "[t]he ALJ issued his decision denying Plaintiff benefits on May 24, 2018." (*Id.* at 14.) He argues this shows that the severe impairment described by Dr. Koutros lasted for a period of more than 12 months. (*Id.* at 14.) He points out that there are only two treatment notes from the period following his re-sentencing: Dr. Koutros' notes from October 12 and November 9, 2017. (Doc. No. 15 at 2.) Dr. Koutros' mental status examinations on those visits showed abnormal findings, and her treatment notes contain other indicators of mental impairment. (*Id.*)

Szczepanski also contends the ALJ's decision to give Dr. Koutros' opinion little weight is not supported by the objective evidence. (Doc. No. 12 at 14.) He notes the ALJ inaccurately referred to the State Agency reviewing psychologists as "consultative examiners" when referencing their opinions,[7] and asserts that because Dr. Koutros' "Off-track/Absenteeism Questionnaire" was "the only opinion of record to address off-task behavior," it is entitled to complete deference. (*Id.*) Finally, he argues that even if the Court finds that there was an inconsistency between the opinions

---

[7] The Commissioner acknowledges this error. (Doc. No. 14 at 12.)

of Dr. Koutros and the State Agency reviewing psychologists, Sixth Circuit precedent does not support "discount[ing] the treating physician's opinion merely because the opinion is not in perfect alignment with the opinion of another doctor."  (Doc. No. 12 at 13.)

The Commissioner accepts the assertion that Szczepanski's severe symptoms began in December 2016 and continued until the date of Dr. Koutros' opinion, but he argues the ALJ's determination properly is based on his conclusion that Szczepanski's mental health conditions improved significantly after his re-sentencing, as described in section VI.A.1, *infra*.  (Doc. No. 14 at 11-13.)  This occurred after Dr. Koutros filled out the "Off-track/Absenteeism Questionnaire" on September 7, 2017, and before Szczepanski's October 12, 2017 appointment.  (Tr. 471, 508.)  He points out that this improvement is documented in Dr. Koutros' treatment notes, and that Szczepanski "provided no other medical opinions to support his argument that he was disabled up until the ALJ issued his decision in May 2018."  (Doc. No. 14 at 12.)  The Commissioner asserts that Szczepanski failed to meet the burden of demonstrating that he remained disabled up to May 2018, when the ALJ issued his decision, because Szczepanski did not present any medical evidence showing that he continued to have such severe symptoms after his October 2017 re-sentencing.  (*Id.*)  He argues that the ALJ properly considered the State Agency reviewing psychologists' opinions and Dr. Koutros' treatment notes to determine that Szczepanski had "moderate symptoms on a longitudinal basis." (*Id.*) Finally, the Commissioner argues that, although Dr. Koutros' opinion was the only one that directly addressed an off-track limitation, it is contradicted by objective medical evidence and therefore is not entitled to complete deference.  (*Id.*)

As the Commissioner points out, Dr. Koutros opined Szczepanski suffered "anxiety/depression as a result of legal issues, which cause focus/attention/concentration difficulties."

(Tr. 471.)  The doctor also checked a box indicating that his "severity of limitation" had not existed since February 2015, but only "since his sentencing - Dec 2016."  (*Id.*)  The statement that Szczepanski's "anxiety/depression [are] as a result of legal issues" and the statement that these impairments had only existed since his sentencing were the only two sentences that she wrote - the rest of the opinion was a check-box form.  (*Id.*)  Thus, in determining that Dr. Koutros' opinion related to Plaintiff's stress from legal issues, the ALJ was relying on Dr. Koutros' opinion.

The period in dispute between the parties is brief - October through November 2017.  The only two treatment notes from this period show gradual, but clear, improvement.  On October 12, 2017, Dr. Koutros wrote that after Szczepanski "found out things would likely go in his favor" and was "sentenced to 21 days house arrest," he had been "sleeping all day every day as if catching up on all the lost sleep he had prior.  Mood a little better.  Anxiety has calmed down a little." (*Id.* at 508*.*)

On November 11, 2017, Dr. Koutros again began her clinical notes with a description of Szczepanski's legal issues: he was "currently on house arrest."  (*Id.* at 503.)  Geodon, which he took in the evening, sedated him but also made him "less depressed, more motivated, calmer."  (*Id.* at 506.) He reported "more motivation" and that he felt "calmer, not as restless."  (*Id.* at 503.)  He reported that the "sedating effect of Geodon has gotten better over time so willing to continue taking it for longer period of time."  (*Id.* at 503.)  His score on the PHQ-9 Patient Heath Questionnaire had dropped 6 points, from 25 to 19, and he had moved from the category of "severe depression" to "moderate severe depression." (*Id.* at 510-11, 505-06.)  All this supports the ALJ's conclusion that although Dr. Koutros' opinion was an accurate reflection of Szczepanski's mental limitations at the time she completed the questionnaire, his severity of symptoms changed significantly within a month. Further, as both parties acknowledged, these two treatment notes are the only objective medical

26

evidence provided from this period. (Doc. No. 12 at 13; Doc. No. 14 at 12.)

The Court concludes that substantial evidence supports the ALJ's determination that "Dr. Koutros' opinion related to Plaintiff's stress from legal issues and that plaintiff's symptoms improved . . . after his sentencing according to Dr. Koutros' treatment notes." The burden of proving 12 continuous months of disability is on Szczepanski. Neither Dr. Koutros' opinion nor the objective medical evidence establish that Szczepanski's limitations remained at the severity Dr. Koutros described in her opinion for the continuous 12-month period required for a finding of disability under 20 C.F.R. § 404.1509.

Because the ALJ had a sound basis for his conclusion that Dr. Koutros' opinion does not describe Szczepanski's symptoms for a continuous 12-month period, even if the ALJ gave the opinion complete deference, it would not establish that he was disabled for a 12-month period and would not change the outcome of this case.[8] The Court concludes that the ALJ's treatment of Dr. Koutros' opinion is based on substantial evidence and complies with the treating physician rule. Accordingly, this argument is without merit, and does not provide a basis for remand.

---

[8] There is undoubtedly an inconsistency between the opinions of State Agency reviewing psychologists and Dr. Koutros, and this bolsters the credibility of all the doctors. The State Agency reviewing psychologists gave their opinions based on the record as it existed in May and August 2016, and Dr. Koutros' opinion states that it reflects as "severity of impairment" that only existed since December 2016 (Tr. 76, 92, 471.) It is credible that all the doctors' opinions are accurate, and the inconsistency between them is caused by the change in Szczepanski's symptoms over time. So it is reasonable for the ALJ to use the State Agency reviewing psychologists' opinions as substantial evidence that Szczepanski "exhibited moderate symptoms on a longitudinal basis," as he asserts, and not reasonable to assume that he discounted Dr. Koutros' opinion because it "is not in perfect alignment" with the State Agency reviewing psychologists' opinions, as Szczepanski asserts. (Tr. 21, Doc. No. 12 at 15.)

B.      **Second Assignment of Error: Social Security Ruling 16-3p.**

Szczepanski next argues that the ALJ's assessment of Szczepanski's statements failed to comply with Social Security Ruling 16-3p.  That ruling states, "we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *5 (S.S.A. Oct. 25, 2017). Szczepanski points to the words of the ALJ's opinion as proof of non-compliance with this Ruling:

> As for the claimant's statements about the intensity, persistence and limiting effects of his or her symptoms, they are inconsistent because the objective medical record does not support the alleged level of limitation.

(Doc. No. 12 at 16-17.)  This sentence is set apart in a paragraph of its own, and is, by itself, inadequate. (Tr. 17.)

In response, the Commissioner lists the many other findings the ALJ made regarding Szczepanski's activities of daily living, including his ability to travel, play video games, and attend major league sporting events.  (Doc. No. 14 at 15.)  He also notes that the ALJ's opinion explicitly considered ways the side effects of Szczepanski's obesity and medications might impact his symptoms. (*Id.*)  The ALJ also considered the effects of Szczepanski's January 2014 car accident and his legal troubles on his symptoms and functioning. (Tr. 18-22.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms.  *See, e.g., Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir. 2014); *Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 821 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate

28

the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the individual's statements based on the entire case record.  The evaluation of a claimant's subjective complaints rests with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  Beyond medical evidence, Social Security Ruling 16-3p sets forth seven factors that the ALJ should consider.[1]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).  The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").  While a

---

[1] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7.

reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), *report and recommendation adopted by* 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

The ALJ found Szczepanski's alleged symptoms satisfied the first step of the two-step test because "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 17) However, at the second step, the ALJ found Szczepanski's statements about the severity of his symptoms to be "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*) As the Commissioner notes, the ALJ then discussed both medical and non-medical evidence at considerable length. He detailed the evidence that led to his conclusion, including:

• "The claimant described an incident in which he traveled out of state to Boston to see a concert. The claimant explained he was late to the concert because he did not want to leave his hotel room and then spent the balance of his time at the bar or in the bathroom." (*Id.*)

• "The claimant reported he had just returned from a trip to WrestleMania and had another trip planned to Las Vegas that he was not excited about." (*Id.* at 18.)

• "[T]he claimant did not fill prescriptions for financial reasons but also spent approximately $4000 on a video game, traveled, and purchased tickets including season tickets for a professional basketball team." (*Id.*)

• "[T]he claimant went to a bachelor party and had normal memory, affect and mood." (*Id.*)

• "The evidence shows that even when the claimant experienced aggravated symptoms he could play video games and went to the store to purchase a new video game." (*Id.* at 22.)

As discussed in sections VI.A., *infra*, the ALJ considered the way stress surrounding Szczepanski's legal issues impacted his symptoms. He also discussed the way that Szczepanski's obesity and the side

effects of certain medications - including headaches and fatigue - impacted his symptoms. (*Id.* at 20-21.)  The totality of the ALJ's opinion makes clear that he properly considered factors besides objective medical evidence in evaluating Szczepanski's statements about his symptoms.  The Court concludes that ALJ's assessment of Szczepanski's statements regarding the severity of his symptoms is based on substantial evidence and complies with Social Security Ruling 16-3p.  Accordingly, this argument is without merit, and does not provide a basis for remand.

### VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be **AFFIRMED**.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 25, 2019

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**